## FOR PUBLICATION



ATTORNEYS FOR PIERSON APPELLANTS:

**DANIEL S. CHAMBERLAIN**
**DANIEL J. BUBA**
Doehrman Chamberlain
Indianapolis, Indiana


ATTORNEY FOR CANADA APPELLANTS:

**MARC S. SEDWICK, ESQ.**
Sedwicklaw, P.C.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
SERVICE AMERICA CORPORATION
d/b/a CENTERPLATE:

**MICHAEL D. MOON, JR.**
**MARK J. CRANDLEY**
**JIMMIE L. MCMILLIAN**
Barnes & Thornburg LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| TIERRA RAE PIERSON, a Minor, Deceased, by her next friend and parent, BETINA PIERSON, and BETINA PIERSON, Individually, and RYAN PIERSON, Individually, Appellants-Plaintiffs, | ) ) ) ) ) ) | |
| vs. | ) ) | No. 49A02-1307-CT-561 |
| SERVICE AMERICA CORPORATION d/b/a CENTERPLATE and JENNIFER MOORE, Appellees-Defendants. | ) ) ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Robert R. Altice Jr., Judge
Cause No. 49D05-1012-CT-55716
Cause No. 49D07-1102-CT-6455

**May 21, 2014**

**OPINION - FOR PUBLICATION**

**BAILEY, Judge**

**Case Summary**

Tierra Rae Pierson, Deceased, by her next friend, Betina Pierson; Ryan Pierson;

Betina Pierson, individually; and January Canada, by her next friend, Jennifer Moore,

(collectively, "Pierson") appeal a grant of summary judgment in favor of Service America

Corporation d/b/a Centerplate ("Centerplate") on Pierson's negligence claim. We reverse.[1]

**Issue**

A single, consolidated issue is presented: whether the trial court improvidently granted

summary judgment to Centerplate. More specifically, Pierson claims that genuine issues of

material fact preclude summary judgment and the trial court did not view the evidence in the

light most favorable to the non-movant as required by the Indiana summary judgment

standard.

**Facts and Procedural History**

Trenton Gaff ("Gaff") was intoxicated[2] when his vehicle struck and killed twelve-

year-old Tierra Rae Pierson and injured her cousin, twelve-year-old January Canada. Earlier

in the day, Gaff had attended a Colts game at Lucas Oil Stadium and had consumed alcoholic

beverages at a pre-game tailgate party, during the game, and at a post-game tailgate party.

Separate lawsuits were filed by Pierson's and Canada's parents. The complaint filed

by Jennifer Moore, as next friend of January Canada, alleged that Centerplate, the vendor of

---

[1] We held oral argument in this case at New Castle High School in New Castle, Indiana, on April 24, 2014. We wish to thank the school administration and the Henry County Bar Association for their hospitality. We thank counsel for their able advocacy.

[2] Gaff, who had a blood alcohol content of 0.20 at the time of the accident, pled guilty to Operating a Motor Vehicle with a BAC of 0.15 or Greater Causing Death, as a Class B felony. Ind. Code § 9-30-5-5.

alcoholic beverages at Lucas Oil Stadium, "negligently failed to train, instruct, monitor, and restrict the sale of alcoholic beverages to visibly intoxicated patrons, including Gaff." (App. 30.) The amended complaint filed by Pierson's parents made the same allegation but also alleged that Moore had been negligent in allowing the cousins to walk near the roadway in the dark and unsupervised.

The discovery process did not yield the identity of the person or persons who had sold alcoholic beverages to Gaff inside Lucas Oil Stadium. Centerplate moved for summary judgment on the negligence claims against it. The trial court granted the motion, concluding that there was no evidence that a Centerplate employee or designee[3] served alcohol to Gaff while he was visibly intoxicated and that there was no evidence that alcohol provided by Centerplate was a proximate cause of the accident. The Pierson and Canada cases were consolidated for purposes of this appeal.

Standard of Review

Our standard of review for appeals from summary judgment is well established:

When reviewing a grant of summary judgment, our standard of review is the same as that of the trial court. Considering only those facts that the parties designated to the trial court, we must determine whether there is a "genuine issue as to any material fact" and whether "the moving party is entitled to a judgment as a matter of law." In answering these questions, the reviewing court construes all factual inferences in the non-moving party's favor and resolves all doubts as to the existence of a material issue against the moving party. The moving party bears the burden of making a prima facie showing that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law; and once the movant satisfies the burden, the

---

[3] Centerplate procured and trained volunteers from not-for-profit groups for the service of alcoholic beverages at Lucas Oil Stadium. The not-for-profit group would receive a portion of the profits. As such, the actual servers were not Centerplate employees.

burden then shifts to the non-moving party to designate and produce evidence of facts showing the existence of a genuine issue of material fact.

Dreaded, Inc. v. St. Paul Guardian Ins. Co., 904 N.E.2d 1267, 1269-70 (Ind. 2009) (internal citations omitted).

When the defendant is the moving party, the defendant must show that the undisputed facts negate at least one element of the plaintiff's cause of action or that the defendant has a factually unchallenged affirmative defense that bars the plaintiff's claim. First Farmers Bank & Trust Co. v. Whorley, 891 N.E.2d 604, 608 (Ind. Ct. App. 2008), trans. denied. In negligence cases, summary judgment is "rarely appropriate." Rhodes v. Wright, 805 N.E.2d 382, 387 (Ind. 2004). Summary judgment "should not be used as an abbreviated trial, even where the proof is difficult or where the court may believe that the non-moving party will not succeed at trial." Hudson v. Davis, 797 N.E.2d 277, 287 (Ind. Ct. App. 2003), reh'g denied, trans. denied.

Here, the trial court entered findings of facts and conclusions thereon. While a trial court's enunciation of findings and conclusions on such matters may aid our review and reveal the reasoning of the trial court, they are not required and are not binding upon appeal. New Albany Historic Pres. Comm'n v. Bradford Realty, Inc., 965 N.E.2d 79, 84 (Ind. Ct. App. 2012). The role of the trial court at summary judgment is not to act as a trier of fact, but rather to determine whether the movant established, prima facie, either that there is insufficient evidence to proceed to trial, or that the movant is otherwise entitled to judgment as a matter of law. Kader v. State Dept. of Correction, 1 N.E.3d 717, 727 (Ind. Ct. App.

4

2013). Witness credibility and the relative apparent weight of evidence are not relevant considerations at summary judgment. Id.

Analysis

A defendant is liable to a plaintiff for the tort of negligence if (1) the defendant has a duty to conform its conduct to a standard of care arising from its relationship with the plaintiff, (2) the defendant has failed to conform its conduct to that standard of care, and (3) an injury to the plaintiff was proximately caused by the breach. Indianapolis-Marion Cnty. Pub. Library v. Charlier Clark & Linard, P.C., 929 N.E.2d 722, 726 (Ind. 2010).

Whether there is a legal duty owed by one party to another in a negligence action is generally a question of law for the court to decide. Chandradat v. State, Ind. Dep't of Transp., 830 N.E.2d 904, 908 (Ind. Ct. App. 2005), trans. denied. In making the determination of duty or lack of duty, a three-part test developed by our Supreme Court (relationship between the parties, reasonable foreseeability of harm to the person injured, and public policy concerns) "can be a useful tool." Yost v. Wabash College, 3 N.E.3d 509, 515 (Ind. 2014). However, the test is employed only when the element of duty has not already been declared or otherwise articulated.

The duty to conduct oneself to avoid harm from another person's intoxication is embodied in Indiana's Dram Shop Act. At the time Gaff became intoxicated and caused injury, Indiana Code section 7.1-5-10-15(a), prohibiting the furnishing of an alcoholic beverage to an intoxicated person, provided:

5

It is unlawful for a person to sell, barter, deliver, or give away an alcoholic beverage to another person who is in a state of intoxication if the person knows that the other person is intoxicated.

Indiana Code section 7.1-5-10-15.5, addressing civil liability and defining "furnish,"

provides:

(a) As used in this section, "furnish" includes barter, deliver, sell, exchange, provide, or give away.

(b) A person who furnishes an alcoholic beverage to a person is not liable in a civil action for damages caused by the impairment or intoxication of the person who was furnished the alcoholic beverage unless:

(1) the person furnishing the alcoholic beverage had actual knowledge that the person to whom the alcoholic beverage was furnished was visibly intoxicated at the time the alcoholic beverage was furnished; and

(2) the intoxication of the person to whom the alcoholic beverage was furnished was a proximate cause of the death, injury, or damage alleged in the complaint.

(c) If a person who is at least twenty-one (21) years of age suffers injury or death proximately caused by the person's voluntary intoxication, the:

(1)     person
(2)     person's dependents;
(3)     person's personal representative; or
(4)     person's heirs;

may not assert a claim for damages for personal injury or death against a person who furnished an alcoholic beverage that contributed to the person's intoxication, unless subsections (b)(1) and (b)(2) apply.

The prescribed duty is one of omission; a furnisher is to refrain from serving alcohol

to a person he or she knows to be visibly intoxicated.  "Proximate cause places an effective

limit on dram shop liability[.]"  Nat'l R.R. Passenger Corp. v. Everton, 655 N.E.2d 360, 365

(Ind. Ct. App. 1995), trans. denied.  If the duty of omission is breached and damages are

6

caused by the intoxicated person, the provision of alcohol may be considered to be a proximate cause of ensuing damage; it need not be the only proximate cause. Id. at 367. "The Dram Shop Act represents a legislative judgment and the declared public policy of this state that providers of alcoholic beverages should be liable for the reasonably foreseeable consequences of knowingly serving visibly intoxicated persons." Id. at 366. The foreseeability of an intervening cause and, thus, whether a defendant's conduct is a proximate cause of the plaintiff's injury, presents a question of fact for the jury. Id. at 366-67.

In Delta Tau Delta, Beta Alpha Chapter v. Johnson, 712 N.E.2d 968, 974 (Ind. 1999), our supreme court summarized Indiana case law regarding "furnishing" and "actual knowledge" of intoxication, as those terms appear in Indiana Code section 7.1-5-10-15.5:

> The furnisher's knowledge must be judged by a subjective standard. Absent an admission that the person furnishing alcohol had actual knowledge of the other's intoxication, the trier of fact must look to reasonable inferences based upon an examination of the surrounding circumstances. Actual knowledge of intoxication can be inferred from indirect or circumstantial evidence such as what and how much the person was known to have consumed, the time involved, the person's behavior at the time, and the person's condition shortly after leaving. Where, however, there is insufficient evidence to support actual knowledge, the issue may be resolved as a matter of law.

(internal citations and quotations omitted).

When determining whether a furnisher of alcoholic beverages knew a person was intoxicated, we look to what and how much a person was known to have consumed, the person's behavior at the time, and the person's condition. Ashlock v. Norris, 475 N.E.2d 1167, 1170 (Ind. Ct. App. 1985).

7

Centerplate argued, and the trial court agreed, that the designated materials do not reveal that a Centerplate employee or designee served Gaff alcohol with actual knowledge that he was visibly intoxicated. Thus, according to Centerplate, its provision of some amount of alcohol to Gaff could not be a proximate cause of the injuries at issue. Pierson argues that, although the identity of the server or servers is not known at this time, a reasonable inference may be drawn that Gaff would have exhibited visible signs of intoxication by the time he purchased beer from a Centerplate agent inside the stadium. Pierson further observes that Centerplate was the sole source of alcohol sales inside the stadium, Centerplate is responsible for the actions of its agents, and the designated evidence allows an inference that Centerplate through its agents had knowledge Gaff was intoxicated when served. According to Pierson, the element of proximate cause has not been negated by Centerplate.

Discovery depositions were conducted and a time-line of events was established:

Gaff arrived at a pre-game tailgate at Lucas Oil Stadium at 12:00 to 12:45 and drank alcohol. He ate a hamburger, reportedly his only food of the day.

Gaff attended the 1:00 p.m. Colts game inside the stadium, and drank alcohol of some amount.

Gaff left the stadium at the game end around 4:15 to 4:30 p.m. and stopped for a tail-gate party. He again drank alcohol.

The fatal accident took place at approximately 6:00 p.m.

Around 7:00 p.m. Officer Marlin Sechrist, DUI investigator, arrived at the accident scene and observed an impaired Gaff. The officer administered the horizontal gaze, walk-and-turn, and one-leg stand field sobriety tests; Gaff failed them all. Gaff admitted to having six beers, five at the game. (App. 385.) He did not specify inside/outside the stadium.

When Gaff's blood was drawn at 7:50 p.m., his BAC was 0.200. A portable Breathalyzer test at 8:00 p.m. registered a BAC of 0.205.

When deposed, Gaff opined that he would, given his weight of 200 pounds, "probably" become intoxicated after having "around three or four drinks." (App. 83.) Although Gaff admitted that he drank before the game, during the game, and after the game, the designated materials do not reveal a consensus on Gaff's specific consumption of alcohol at a particular point. At the accident scene, Gaff told Officer Sechrist that he had consumed "five beers at the Colts game … one after the game." (App. 385.) Officer Sechrist's observations led him to believe, apart from testing, that Gaff was "very intoxicated." (App. 403.)

At his deposition, Gaff admitted to having had four imported beers he had brought to the tailgate parties and two Bass beers inside the stadium "from what I remember." (App. 88.) He also conceded he didn't know an "exact" number and may have had as many as three beers post-game. (App. 80, 110.)

Gaff's companions at the game and tailgate parties testified in depositions that they had seen relatively little alcohol consumption by Gaff and didn't detect signs of intoxication. According to Richard Crider, he personally observed Gaff drinking two beers inside the stadium and one "in the parking lot." (App. 137.) He testified that, when Gaff left the tailgate around 5:45 p.m., he carried with him four or five beers left out of a six-pack.[4] Kallie Crider testified in her deposition that she didn't see Gaff drink before the game and

_____

[4] According to Gaff, he had brought a single six pack of beer.

9

"barely during."[5]  (App. 159.)  She acknowledged that her husband and Gaff sometimes bought drinks for each other.

Toxicologist Harry Plotnik opined that, if the information provided by Gaff and the Criders had been accurate, Gaff's blood alcohol content would not have registered 0.20 at 8:00 p.m. on the day in question, but would be "significantly less."  (App. 776.)  Officer Sechrist opined that, based upon his experience as an investigator, a person with a blood alcohol level above .08 will show visible signs of intoxication.  Research scientist Eldon Nyhart executed an affidavit wherein he projected, after having applied a "Widmark"[6] formula to extrapolate a blood alcohol content backwards from the blood draw, Gaff had more likely than not been intoxicated and exhibiting visible signs of intoxication when he purchased alcohol inside the stadium.[7]  He believed Gaff had imbibed more than eight beers.[8]

Centerplate discredits the Nyhart affidavit as offering "generalizations" and asserts: "There is simply no evidence of what occurred when the alcohol was sold."  Appellee's Brief at 19-20.  According to Centerplate, "Absent evidence of what actually occurred during any point of sale transaction with Centerplate, the trial court properly granted summary judgment."  Appellee's Brief at 16.  However, as we have previously observed, the non-

---

[5] At the same time, she acknowledged that he typically had five or six drinks when socializing.

[6] Erik M. P. Widmark was known for "fundamental work on blood alcohol analysis and pharmacokinetics" and developed an equation for estimating the amount of alcohol in the body from values of specific input variables. (App. 556.)

[7] The trial court denied Centerplate's motion to strike the expert opinion affidavit but found that the affidavit lacked "enough facts to back it up."  (App. 21.)

[8] Officer Sechrist also opined that Gaff had more than five or six beers "to get to 2-0."  (App. 413.)

movant is not obliged to participate in an abbreviated trial to withstand summary judgment. Hudson, 797 N.E.2d at 287. See also Carrell v. Ellingwood, 423 N.E.2d 630, 636 (Ind. Ct. App. 1981) (explaining that even if a trial court believes that a party moving for summary judgment will prevail at trial or believes that the likelihood of the nonmoving party's recovery is improbable, "such are no bases for summary judgment"). Instead, in determining whether summary judgment is appropriate, we construe all facts and reasonable inferences in favor of the nonmoving party. Mangold ex rel. Mangold v. Ind. Dep't of Natural Res., 756 N.E.2d 970, 973 (Ind. 2001). We carefully review a decision on summary judgment to ensure a party is not improperly denied his day in court. Id. at 974.

Here, there are several undisputed facts: Gaff left Lucas Oil Stadium after the game ended around 4:00 p.m. and left the tailgate party around 5:45 p.m. At 6:04, an emergency call was placed to 9-1-1 to report that Gaff's vehicle had struck two victims. Blood testing at 7:50 p.m. revealed a blood alcohol content of 0.20. Gaff had consumed alcohol in the preceding hours. How much alcohol Gaff imbibed at each point of consumption, whether he was intoxicated at the Bass beer stand, and whether or not he would have appeared visibly intoxicated, is not resolved by reference to undisputed facts.

The designated record could be said to support one of several scenarios, that is, Gaff drank before and during the game to the point where he would have exhibited signs of intoxication observable by the stadium volunteer selling him beer; Gaff drank to excess only after leaving the stadium; or Gaff was intoxicated inside the stadium but did not exhibit visible signs of intoxication. Ultimately, it is the role of the fact-finder, and not the court in

11

summary judgment proceedings, to determine issues of credibility or relative weight of the evidence – for example, whether self-reporting of alcohol consumption was inaccurate or an expert opinion based upon a toxicology report was flawed. See Kader, 1 N.E.3d at 727. Too, even though Gaff reportedly drank in different venues, it is the role of the fact-finder to determine whether any one drink was served to Gaff by someone knowing him to be visibly intoxicated.

In Ward v. D & A Enterprises of Clark County, Inc., 714 N.E.2d 728 (Ind. Ct. App. 1999), the estate of a motorist who was killed in a collision with an intoxicated motorist brought a dram shop action against the tavern that had furnished the beer to the intoxicated motorist shortly before the accident. The designated materials disclosed that the intoxicated motorist did not appear intoxicated prior to his arrival at the tavern, yet seventy-five minutes later, at the scene of the accident, he failed nine field sobriety tests and registered a 0.22% blood alcohol content on a Breathalyzer. Id. at 730. A panel of this Court held that "the fact [that the tavern] served even one beer to a person who shortly thereafter was in a state of serious intoxication gives rise to a question of fact whether [the intoxicated motorist] was visibly intoxicated at the time [he was served]." Id.

In Vanderhoek v. Willy, 728 N.E.2d 213 (Ind. Ct. App. 2000), the designated materials indicated that Terry Neil ("Neil") was served at least three beers at the Fraternal Order of Eagles ("the FOE"), some of which were ordered by his mother, Gertrude Willy ("Willy"). Various patrons averred that Neil had not shown signs of visible intoxication. However, a short time after leaving the FOE, Neil was involved in an accident (one and one-

12

half blocks away) and registered a BAC concentration of 0.15%. The <u>Vanderhoek</u> Court concluded that a reasonable inference could be drawn that the FOE had actual knowledge of Neil's intoxication at the time he was served and therefore, the trial court did not err by denying the FOE's motion for summary judgment in an action brought by injured motorist Michelle Vanderhoek. <u>Id.</u> at 217.

At the same time, the Court concluded that summary judgment had erroneously been granted to Willy. The Court observed that Willy and Neil had been seated together and inferences could be drawn that Willy possessed or controlled at least some of the alcoholic beverages consumed by Neil and that she had actual knowledge of his intoxication. <u>Id.</u> at 218. The Court observed that the Dram Shop Act does not distinguish between a gratuitous server and a tavern and held:

> [W]hen applying Indiana's Dram Shop Act and relevant case law it matters not whether <u>one more drink</u> was served by the FOE or Willy. In the context of this case the independent acts of the FOE and Willy in furnishing alcohol to Neil create genuine issues of material fact causing the trial court's grant of summary judgment in favor of Willy to be in error.

<u>Id.</u> (emphasis in original).

Here, there is likewise a genuine issue of material fact as to whether a Centerplate agent served Gaff even a single drink with actual knowledge of his visible intoxication. At oral argument in this case, Pierson contended that Centerplate, the sole provider of alcoholic beverages at Lucas Oil Stadium, was a "person" for purposes of the Dram Shop Act, acting through its hundreds of agents at myriad points of sale. We agree.

13

Were we to accept Centerplate's argument that only a single inference arises, that is, no liability can ensue because no particular server to Gaff has been identified, such would circumvent the public policy associated with the Dram Shop Act. In comparison to a neighborhood bar owner employing a few servers, a provider of alcoholic beverages using hundreds of volunteers to sell alcohol to thousands of patrons in a stadium may well seem ideally situated to lessen liability although the potential consequences are greatly increased. We do not believe this to be the intent of our Legislature. It is for the fact-finder, and not the court on summary judgment, to determine whether Centerplate knowingly provided one more alcoholic beverage to a visibly intoxicated patron.

**Conclusion**

Reasonable inferences to be drawn from the designated materials could permit a fact-finder to conclude that a Centerplate designee served Gaff beer while knowing him to be visibly intoxicated. As Centerplate did not, based upon undisputed facts, negate an element of Pierson's negligence claim, summary judgment was improvidently granted.

Reversed.

NAJAM, J., and MAY, J., concur.